IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                   :
BRIAN STEELE AND JUDIKAELLE        :      HON. JEROME B. SIMANDLE
STEELE,                            :
                                   :      Civil No. 09-4340 (JBS/JS)
              Plaintiffs,          :
                                   :
     v.                            :            OPINION
                                   :
ARAMARK CORPORATION, et al.,       :
                                   :
              Defendants.          :
                                   :
```

APPEARANCES:

Daniel B. Zonies, Esq.
1011 Evesham Road, Suite A
Voorhees, NJ 08043
     -and-
Gary David Ginsberg, Esq.
GINSBERG & O'CONNOR, P.C.
3000 Atrium Way, Suite 330
Mount Laurel, NJ 08054
     Attorneys for Plaintiffs Brian Steele and Judikaelle Steele

Lawrence B. Berg, Esq.
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
Woodland Falls Corporate Park
200 Lake Drive East, Suite 300
P.O. Box 5049
Cherry Hill, NJ 08002
     -and-
David W. Field, Esq.
LOWENSTEIN, SANDLER, PC
65 Livingston Avenue
Roseland, NJ 07068
     Attorney for Defendants Aramark Uniform & Career Apparel,
     Inc. and Aramark Uniform & Career Apparel, LLC

Eric Michael Gernant, Esq.
MCGIVNEY & KLUGER, PC
23 Vreeland Road, Suite 220
Florham Park, NJ 07932
     Attorney for Defendant Quad Graphics, Inc.

**SIMANDLE,** Chief Judge:

## I.   INTRODUCTION

This matter is before the Court on four motions:  Defendant Quad Graphics, Inc.'s ("Quad") motion for summary judgment and to bar Plaintiffs' experts [Docket Item 63]; Defendants Aramark Uniform & Career Apparel, Inc. and Aramark & Career Apparel, LLC's (collectively referred to as "Aramark") two motions for summary judgment [Docket Items 59 and 64]; and Quad's motion to preclude Plaintiff's Affidavit dated July 19, 2011 [Docket Item 78], which was joined by Aramark.  Quad also filed a motion against Aramark to compel or enforce the Indemnification Agreement [Docket Item 65] which has been held in abeyance pending the outcome of the above motions. Plaintiffs Brian and Judikaelle Steele have filed opposition to all motions.  The court heard oral argument on February 14, 2012.

## II.   BACKGROUND

### A. Statement of the Facts

The instant action arises out of injuries suffered by Plaintiff Brian Steele ("Plaintiff" or "Steele") while working as a substitute truck driver for Defendant Aramark Uniform & Career Apparel.  Defendant Aramark is a corporation engaged in the business of leasing, supplying, delivering, cleaning and transporting of business and industrial uniforms and other cloth products to and from businesses and other organizations.

2

Defendant Quad is a printing company and uses Aramark's services to launder its print shop towels.  During his time as a substitute truck driver, Plaintiff Steele transported used print shop towels from Quad's facility in West Virginia to Aramark's facility in New Jersey to be laundered.

Plaintiff Steele has worked for Aramark since July 2004, when Aramark purchased his former employer, U.S. Uniform, for whom he had worked since November 2000.  (Statement of Facts ¶ 1.)  Steele is employed as a "route jumper" or substitute truck driver.  Id.

Between 2007 and 2009, Steele would occasionally drive the route to Quad Graphics in Martinsburg, West Virginia when the regular route driver was unavailable.  (Statement of Facts ¶ 2.)  Steele operated the Quad Graphics route on a normal basis (two times per week) for five months, from April 1, 2007 until August 31, 2007.  (Statement of Facts ¶ 3.)  In August 2007, Steele was diagnosed with nephrotic syndrome.  (Statement of Facts ¶ 4.)  Steele continued to operate the Quad Graphics route on an "as-needed" intermittent basis until 2009.  (Statement of Facts ¶ 5.)

As part of Steele's route responsibilities for Quad Graphics, Steele maintains that he retrieved the print towels, which he alleges were soaked in chemicals, including toluene, in 55-gallon drums.  (Statement of Facts ¶ 6.)  On each trip, Steele would spend four to five hours in the Quad facility wherein he

3

would unload the clean print towels and collect the toluene soaked towels by emptying drums that were only partially full into others until he had full drums to take back to Aramark. (Steele Dep. 97:20-98:2 and 162:21-163:5.)   The drums were then loaded into the back of his delivery truck which had open airflow between the storage compartment and the cabin.  (Steele Dep. 44:11-45:9.)

Steele alleges that the lids to the drums were defective and could not be properly sealed which resulted in them fitting loosely on the top.  (Statement of Facts ¶ 8.)  The drums that transported the print towels from Quad's facilities to Aramark were provided by Aramark.  As a result of the loose fitting lids, Steele testified that during his three hour drive from the Quad facility in West Virginia to the Aramark facility in New Jersey, he smelled a strong chemical odor and experienced headaches and lightheadedness.  (Steele Dep. 9:20-96:6.)

Steele alleges that he reported to Aramark that the print towels had an odor that caused him headaches during the Quad Graphics route drive in July 2007. (Statement of Facts ¶ 9.) Mr. Steele spoke to one of his supervisors at Aramark, Richard Bubser, and complained about the toluene odor and the headaches he experienced while transporting the towels to and from Quad. Mr. Bubser told him that everything was fine.  Mr. Steele accepted Mr. Bubser's statement and did not question the toluene

4

odor or the headaches again.  (Steele Dep. 94:20-96:6.)

In August 2007, Plaintiff Steele was diagnosed with Focal and Segmented Glomerulonephritis ("FSGS") which has developed into End Stage Renal Disease requiring dialysis treatment.

In July of 2009, Steele received a pamphlet from Aramark called "What's the Big Deal about Print Towels:  The Do's and Don'ts of Print Towel Transport and Processing."  (Pl.'s Ex. A and Steele Dep. at 59:18-23.)  This document explained Aramark's policy for handling solvent soaked print towels and informed employees of the danger of exposure to solvents.  (Pl.'s Ex. A.) The document also explains how print towels should be transported in "sealed and covered" containers.  Id.  Prior to receiving this pamphlet in July 2009, Steele did not receive any training from Aramark on how to transport print towels safely or about the dangers of handling solvents.  (Steele Dep. 155:16-156:15.)

The Plaintiff also filed a claim petition with the New Jersey Division of Workers' Compensation seeking Workers' Compensation benefits.  (Aramark Ex. C.)

### B. Procedural History

On July 20, 2009, the Plaintiff filed this lawsuit in the Superior Court of New Jersey Law Division - Camden County. [Docket Item 1.]  The case was removed to federal court on the basis of diversity jurisdiction.  [Docket Item 1.]

In Count I of the complaint, Steele alleges that Aramark and

5

Quad acted intentionally, willfully, wantonly, and/or with callous indifference by not warning Steele or employing reasonable safety measures to protect Steele from exposure to hazardous chemicals endemic to his job.  The second count alleges Aramark and Quad were negligent in failing to employ reasonable safety measures, and/or to apply industry standards of safety, in protecting plaintiff from exposure to hazardous chemicals endemic to his job.  Count III alleges the defendants conduct was outrageous and shocking to the conscience whereby the Plaintiff demands punitive damages.  Count IV is a loss of consortium claim brought by Steele's wife, Judikaelle Steele.  [Docket Item 1-1.]

The Defendants then filed their answers to the complaint and subsequently met with Magistrate Judge Schneider for a scheduling conference.  A scheduling order was entered which provided that pretrial factual discovery should be concluded by June 30, 2010 and Plaintiffs' expert reports and expert disclosures were to be served by July 30, 2010 and the Defendants expert reports and expert disclosures were to be served by August 31, 2010.  [Docket Item 14.]  The Plaintiff was then deposed on May 6, 2010.

Magistrate Judge Schneider entered an amended scheduling order extending the deadline for factual discovery until October 29, 2010 [Docket Item 40.]  Judge Schneider also extended the deadline for expert reports and depositions for both parties.  The expert reports and depositions were to be concluded by June

30, 2011.  [Docket Item 50.]  The Plaintiffs served four expert reports on December 31, 2010.  The Defendants served five expert reports by March 4, 2011.  Five expert depositions, which included three of the Plaintiffs' experts and two of Quad's experts, were conducted by June 23, 2011.

On June 29, 2011, Plaintiff's counsel for the first time advised in a letter that Plaintiff Steele was now alleging there was free liquid in the drums of used towels.  On June 30, 2011, Plaintiff's last expert was deposed.

Judge Schneider conducted a telephone hearing on July 14, 2011 regarding the Plaintiffs' late amendment to discovery and while Judge Schneider permitted the Plaintiffs to amend their discovery with an affidavit, Judge Schneider also allowed the Defendants to preserve their right to move to bar the proposed new discovery from trial since none of the experts in the case were made aware of this factual allegation.  [Docket Item 57.]

On July 18, 2011, Defendants' last expert deposition was conducted.  On July 19, 2011, Plaintiff Steele submitted his affidavit stating he observed liquid in the drums.

Subsequently, the instant motions for summary judgment and motion to bar Plaintiff's July 19, 2011 affidavit were filed.

### III.  QUAD'S MOTION TO EXCLUDE PLAINTIFF'S AFFIDAVIT DATED JULY 19, 2011

#### A.  Instant Motion

Defendant Quad has moved to strike Plaintiff's Affidavit

dated July 19, 2011 ("Affidavit").  Defendant Aramark has joined in this motion.  The Plaintiff submitted his July 19, 2011 affidavit in opposition to Defendant Quad and Defendant Aramark's motion to bar Plaintiffs' experts and motion for summary judgment.  [Docket Item 75.]  This opposition was filed by the Plaintiff on November 7, 2011.

The Defendant moves to strike the Affidavit because the Plaintiff averred for the first time since this litigation was filed that there was liquid toluene in the transport drums.  This new fact was presented seven months after fact discovery ended and after all expert reports were served and many of the experts were deposed.  This fact is significant because it alleges a violation of West Virginia Shop Towel Policy which exempts print towels from hazardous waste regulations if all liquid from the shop towel is removed so that no more than one drop remains for removal.  This is called the "one drop rule."  The Plaintiff has not provided any citation for this regulation but provides a copy of the policy as an exhibit.  (Pls.' Ex. E.)

With the addition of this new fact alleging liquid toluene was present in the drums, the Plaintiff can establish negligence per se.  The Plaintiff will be able to show that the West Virginia "one drop" regulation was in place and that Quad violated this regulation.  The Plaintiff will then be able to argue he was then injured as a result Quad's regulatory

violation.

The Defendants move to bar the Affidavit pursuant to Fed. R. Civ. P. 37 and Fed. R. Civ. P. 26.  Specifically, the Defendants argue that a party is required to supplement its Rule 26 disclosures and answers to interrogatories if the answers given were incomplete.  Fed. R. Civ. P. 26(e)(1) and (2).  The Defendants argue that sanctions are warranted pursuant to Rule 37 because there was no substantial justification for Plaintiffs' violation of Rule 26 and the violation caused harm to the Defendants.  In particular, the Defendants had already served their four expert reports and deposed five of the eight potential experts in this case.  None of these experts were aware of Plaintiff's belated allegation that he had allegedly observed liquid toluene in the drums while handling the print towels.

The Plaintiffs oppose this motion.  First, the Plaintiffs argue that in his answers to interrogatories, Steele replied:

> Plaintiff exposed on continuous basis to fumes from solvent soaked print-towels due to his job duties that required him to collect and transport spent print-towels from Quad Graphics in West Virginia to Aramark in New Jersey.

(Pls.' Ex. B.)  The Plaintiff maintains that Steele described the towels as "soaked" and therefore, it should be inferred that there was liquid in the drums.  During Mr. Steele's deposition, he was not asked any questions concerning liquid toluene in the drums.  The Plaintiffs maintain that it was an oversight of the

Defendants not ask Mr. Steele the proper questions at his deposition.  The Defendants oppose this argument and maintain that Mr. Steele was not asked these questions in his deposition because Mr. Steele had never alleged he observed liquid in the drums.  The Plaintiffs rely on the "What's the Big Deal about Print Towels:  The Do's and Don'ts of Print Towel Transport and Processing" pamphlet, distributed in 2009, and argue that Aramark knew there was liquid in the drums at the time Plaintiff handled the drums in 2007.

The Plaintiffs argue the Affidavit should not be excluded. The Plaintiffs contend the information is extremely important to Plaintiffs' case, there is no prejudice to Defendants by allowing Plaintiff's affidavit in evidence, there will be no disruption at trial, any prejudice can be cured by taking the deposition of the Plaintiff anew, and there is no bad faith or willfulness in not disclosing the evidence.

The Plaintiffs state that they failed to disclose this new fact because the issue of whether or not there was free liquid in the containers became highlighted upon the serving of defendant's expert report of James H. Steward, Ph. D. and Dr. Stewart's subsequent deposition which occurred on May 27, 2011.  Dr. Stewart first raised the relevance of the West Virginia Shop Towel Policy and it was at this time that Plaintiff's counsel inquired of Plaintiff as to the issue of free liquid in the

10

containers.

**B. Analysis**

A four-part test is used to determine whether a party breached its duty to amend a discovery response under Rule 26(e)(2): (1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the party knew that the response was incomplete; and (4) whether the corrective information was otherwise made known to the other party through the discovery process or in writing.  Ajax Enters v. Fay, No. 04-4539, 2007 U.S.  Dist. LEXIS 38515, *7 (D.N.J. May 15, 2007); Pfizer, Inc. v. Teva Pharms. USA, Inc., No. 04-754, 2006 U.S. dist. LEXIS 74611, *6 (D.N.J. October 13, 2006).

The Plaintiffs do not contest that they failed to amend their discovery response in a timely way and consequently violated Rule 26(e), which requires a party who has responded to an interrogatory to supplement or correct its disclosure in a timely manner.  Fed. R. Civ. P. 26(e)(1)(A).  However, the Plaintiffs argue that their initial discovery response that the towels were "solvent soaked" was sufficient to put the Defendants on notice that there was also liquid in the drums.  This argument is without merit.

A party is continually required to supplement or correct its initial discovery responses if the response is in any way "incomplete or incorrect."  Fed. R. Civ. P. 26(e).  A party must

11

correct a discovery response in a timely and formal manner unless
the corrective information has "otherwise been made known."  Fed.
R. Civ. P. 26(e).  In order to meet the "otherwise made known"
standard, the "alleged disclosure must be clear and unambiguous."
Eli Lilly & Co. v. Actavis Elizabeth LLC, No. 07-3770, 2010 U.S.
Dist. LEXIS 44913, *13 (D.N.J. May 7, 2010)(citing Gutierrez v.
AT&T Broadband, LLC, 382 F.3d 725, 732-33 (7th Cir. 2004)).
Courts have declined to impose a duty on an adverse party to
infer facts from an ambiguous discovery response.  Instead,
courts have concluded that "disclosures that require such
inferences to be insufficiently clear for Rule 26 purposes."
Pfizer, 2006 U.S. Dist. LEXIS 74611 at *9.  Importantly,
"disclosures during discovery that are not facially apparent and
require the drawing of further inferences are insufficient to
meet the requirements of Rule 26."  Eli Lilly & Co., 2010 U.S.
Dist. LEXIS 44913 at *14.

This particular case involves Plaintiff Steele's exposure to
toluene while transporting print towels and consequently, the
state of the print towels and presence of liquid in the drums are
significant, distinct factual inquiries.  The interrogatory
answer that the towels were "solvent soaked" does not imply that
there was also free liquid in the drums.  Here, the drums were
transporting print towels which were soiled with toluene as the
towels were used to clean printing presses.  Accordingly, it is

not out of the ordinary that the towels themselves would be "soaked" with solvent as Plaintiff Steele's interrogatory answer suggests.

This is wholly different from the allegation that free liquid toluene was in the drums.  This allegation implicates West Virginia print shop towel policies and significantly impacts the calculation of Plaintiff Steele's exposure to toluene. Consequently, this factual allegation cannot be inferred from Plaintiff Steele's previous interrogatory answers and the Defendants cannot be deemed to be on notice of such a fact. Therefore, Plaintiff Steele's previous interrogatory answer which stated the drums contained "solvent soaked print-shop towels" became materially incomplete when the Plaintiffs' submitted the letter to their adversaries that Plaintiff Steele was now alleging he saw toluene in the drums.  It is also noteworthy that Plaintiff chose the same phrase - "solvent soaked print-shop towels" - as appeared in the 2009 Aramark pamphlet about the handling of such cargo, which term denotes the proper and expected condition of these towels, in contrast to barrels containing free toluene.

The Plaintiffs did not notify the Defendants of their allegedly incomplete interrogatory answer until seven months after factual discovery was closed.  This fact was not otherwise disclosed through discovery as Plaintiff Steele did not testify

to it during his deposition and this fact was not referenced in any of the four of Plaintiffs' expert reports.  Further, the allegation that Plaintiff Steele saw free liquid toluene in drums was a fact wholly within Plaintiff Steele's knowledge during the entire course of this litigation and should have been part of the Plaintiffs' initial discovery responses.  By failing to timely inform the Defendants of this crucial fact, the Plaintiffs breached their duty to amend their discovery response under Rule 26(e)(2).

Therefore, the court must decide whether the Plaintiffs will be permitted to use their late amendment to discovery as evidence in opposition to the instant motions for summary judgment and as evidence at trial.

Rule 37(c)(1) provides:

(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.
(1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
  (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
  (B) may inform the jury of the party's failure; and
  (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

The courts have considered the following six factors in determining whether withheld evidence should be excluded:

      (1) the importance of the information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence.

Pfizer, 2006 U.S. Dist. LEXIS 74611 at *11.  See also Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 148 (3d Cir. 2000)(applying the following four factors to determine whether exclusion of the evidence is an appropriate sanction: (1) surprise to the adverse party; (2) ability of the party to cure the prejudice; (3) extent to which allowing the evidence would disrupt trial; (4) bad faith or wilfulness in failing to comply with discovery obligation).  The court considers each of these factors.

      The notion that Plaintiff now claims he observed liquid toluene, and not just soaked towels, in the barrels is new.  As discussed above, claiming the presence of free toluene is not a mere elaboration of the earlier claim of observing solvent-soaked towels.

      Here, it is undisputed that the information withheld is very important to the vitality of Plaintiff's case.  The fact that the Plaintiff now claims to have observed liquid toluene in the drums is relevant to his negligence action against Quad and may be a significant factor in determining Plaintiff's level of exposure to toluene while handling and transporting the drums.

15

Similarly, the prejudice and surprise to the Defendants is also great.  Defendant would have explored this at Plaintiff's deposition if Plaintiff had timely made this dramatic accusation known.  This fact was important and needed to be discussed by their four experts.  The late introduction of this fact renders aspects of their four expert opinions and five expert depositions incomplete or even irrelevant because the entire negligence and causation analysis has changed.  Plaintiffs would seek leave to supplement their experts' reports to take Mr. Steele's new observations into account.  In order to cure the prejudice, the Defendants would at minimum then need to be given an opportunity to develop new rebuttal expert reports and re-depose Plaintiff as well as other fact witnesses, plus, of course, the Plaintiffs' experts.

If this fact is introduced at trial without giving the Defendants an opportunity to conduct further discovery, the trial will be greatly disrupted.  This case will be three years old soon and it needs to be tried without further delay.  The Plaintiffs' case would become a moving target as to the allegations of chemical exposure more than two years after the case was filed, all due to this belated attempt to inject favorable evidence for the first time.  This notion of liquid toluene in the barrels under transport appears in none of the eyewitness depositions of persons familiar with the transport of

16

Quad's print towels, so surprise is obvious.

The Plaintiffs' explanation for failing to disclose this information sooner is lacking.  The Plaintiffs first seem to argue that the Defendants should have inferred this fact from the Plaintiffs' interrogatory answers.  This argument, as discussed above, is without merit.  Second, there is no explanation given for why Plaintiff Steele did not inform his attorneys about the presence of liquid in the drums prior to May 2011.  It seems convenient, to say the least, that directly after Defendants served their expert report which discussed the West Virginia Recycle Shop Towel Policy (and how Quad was in complete compliance with the one drop rule), the Plaintiff should suddenly remember that he saw liquid toluene in the drums.  This is a fact completely within Plaintiff Steele's knowledge and should have been inquired into by Plaintiffs' counsel early in this litigation and disclosed, if it represented Plaintiff's truthful recollection.

It was Plaintiffs' responsibility to fully answer interrogatories and set forth his factual evidence.  The sudden remembrance of a crucial fact after all expert reports were served, most expert depositions were taken, and fact discovery was long closed, is unacceptable as it would disregard the parties' obligations to exchange factual and expert information in an orderly and efficient way, while wasting the court's

17

resources and delaying an adjudication of the merits of the case.

Finally, the court will take note that the Plaintiffs' sudden factual discovery happened just after Plaintiff had new counsel enter an appearance. This new fact was "remembered" once it became apparent that Plaintiff's case for negligence against Quad was under strenuous attack for failure to show breach or cause and new counsel for Plaintiffs was retained to assist in the litigation. The retention of additional counsel likewise does not justify re-doing discovery when the case has already been vigorously litigated for several years.

The Court has considered alternatives to striking the new affidavit from this motion practice, including cost-shifting, informing the jury of Plaintiff's changed position, and the other sanctions listed in Rule 37(b)(2)(A)(i)-(iv), all pursuant to Rule 37(c)(1)(A),(B) and (C), supra. Certain of those sanctions would be overkill, such as striking pleadings or dismissing in whole or in part; others are too mild, such as merely informing the jury of the party's tardy change of position, which is hardly a sanction since the inconsistency could be explored on cross-examination at trial in the normal course in any event. It is an insufficient answer to say that the expenses of reopening and conducting fact and expert discovery could be shifted to Plaintiffs in these circumstances, since that does not address the further delay that will occur, and there is no indication

18

that Mr. and Mrs. Steele could bear such costs, which as noted would be in the tens of thousands of dollars.  The most fitting remedy, incurring the least expense and delay, is to simply leave the case in the same position as it was in before the belated supplementation, by precluding the Plaintiffs from using the new information in this motion and at trial, pursuant to Rule 37(c)(1), supra.

Therefore, Plaintiff Steele's July 19, 2011 affidavit will be stricken and the Plaintiffs will not be permitted to offer evidence that Plaintiff Steele observed free liquid toluene in the drums.  The Plaintiffs' failure to amend their discovery response pursuant to Rule 26(e)(2) cannot be said to be harmless or substantially justified under these circumstances.  The prejudice and surprise to the Defendants is great, even if the Defendants were to be given the opportunity to issue new expert reports and re-depose Plaintiff Steele and Plaintiffs' four expert witnesses, thus incurring double expense since these tasks were completed once already.  Defendants claim to have expended tens of thousands of dollars to discover the facts, complete depositions of many witnesses, retain experts and participate in expert depositions, and there is no reason to doubt Defendants' representations about these expenses and the notion that this must be repeated, at least as to experts, to address this dramatic change in Plaintiff's factual allegations.  The

Plaintiffs have not offered any explanation for their failure to disclose this crucial allegation of fact prior to the conclusion of fact discovery; and the disclosure of this fact after the weaknesses of Plaintiffs' case became apparent and Plaintiffs retained new counsel is suggestive of bad faith.

Therefore, Defendants' motion to strike Plaintiff Steele's July 19, 2011 affidavit will be granted.

## IV.   ARAMARK'S FIRST MOTION FOR SUMMARY JUDGMENT [Docket Item 59]

### A. Instant Motion

Aramark filed the first motion for summary judgment arguing that Plaintiffs' complaint as to Aramark should be dismissed because it is statutorily barred by New Jersey's workers compensation statute, N.J.S.A. § 34:15-8. Specifically, Aramark argues that Plaintiffs' claims based on Aramark's alleged negligent or reckless acts are expressly barred by N.J.S.A. § 34:15-8 and New Jersey law is clear that an employee cannot sue his/her employer for negligence, carelessness, recklessness or wanton behavior. Second, Aramark argues that the Plaintiffs' remaining claims are also barred by N.J.S.A. § 34:15-8 because the Plaintiffs have failed to establish an intentional wrong on the part of Aramark. In particular, Aramark maintains that the Plaintiffs have not satisfied their burden to meet the conduct prong and context prong required to establish an intentional wrong. Finally, Aramark argues that Count IV alleging a loss of

consortium must be dismissed because it is a derivative claim.

The Plaintiffs do not contest that N.J.S.A. § 34:15-8 bars an employee from suing his employer for negligence, carelessness, recklessness or wanton behavior.  Therefore, the Plaintiffs agree that Count II should be dismissed.  However, the Plaintiffs maintain that issues of fact exist as to whether Aramark's acts constitute an intentional wrong and therefore are exempt from the exclusive remedy provision of the Workers' Compensation Act.  The Plaintiffs rely primarily on Plaintiff Steele's July 19, 2011 affidavit and deposition as well as the July 2009 pamphlet issued by Aramark regarding the dangers of solvents.

### B. Analysis

It is well settled in New Jersey that the Workers Compensation Act, N.J.S.A. § 34:15-8, ("WCA") provides employees with an exclusive remedy for an automatic entitlement to certain benefits whenever the employee is injured in an accident arising out of their ordinary course of employment.  Millison v. E.I. Dupont DeNemours & Co., 101 N.J. 161, 179 (1985).  The WCA provides:

> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

It is undisputed that Plaintiff Steele's injuries arose out of the ordinary course of his employment.  The Plaintiffs also do

not dispute that the WCA bars any negligence claims against
Aramark.   Therefore, Count II, which alleges solely negligence,
must be dismissed as to Aramark.

However, the Plaintiffs maintain that Count I and Count III
are not subject to the statutory bar because they allege an
intentional wrong.  In order to fall within the intentional wrong
exception to the WCA, an employee must show that his or her
employer acted willfully or intentionally in causing his work-
related injury.  The employee must meet a two part test, commonly
known as the conduct and context test, to fall within this
exception.  Millison, 101 N.J. at 179.  This two part test
focuses on the nature of the employer's conduct and the context
within which that conduct takes place.  An employee must satisfy
both the conduct and context prong to establish an intentional
wrong on the part of the employer.  An employee is not required
to show  that the employer "subjectively desired to harm him" in
order to satisfy the intentional wrong exception.  Laidlow v.
Hariton Machine Co., 170 N.J. 602, 613 (2002).

No one fact is dispositive of whether an employer's conduct
falls within the intentional wrong exception.  Instead, a court
must look at the totality of the circumstances to determine
whether the exception applies.  Laidlow, 170 N.J. at 622.

### 1. Conduct Prong

The conduct prong addresses whether, "when viewed in a light

most favorable to the employee, the evidence could lead a jury to conclude that the employer acted with knowledge that it was 'substantially certain' that a worker would suffer injury." Laidlow v. Hariton Machine Co., 170 N.J. at 623.  The conduct prong inquiry is a question of fact typically decided by a jury. However, "evaluating whether the context prong has been satisfied is solely a judicial function; thus, if the substantial certainty standard presents a jury question and if the court concludes that the employee's allegations, if proved, would meet the context prong, an employer's motion for summary judgment should be denied, and if not, it should be granted."  Fermaintt ex re. Estate of Lawlor v. McWane, Inc., 694 F. Supp. 2d 339, 345 (D.N.J. 2010).

When evaluating whether an employee's injury was "substantially certain," New Jersey courts have provided insight into the factors a court should consider in determining whether the conduct prong has been satisfied.  In Millison, the New Jersey Supreme Court addressed whether an employee's claim of deliberate exposure to absestos in the workplace fell within the intentional wrong exception.  The employer in Millison conducted physical examinations of its employees which revealed asbestos-related injuries.  The employer's physicians, however, told the employees that their health was fine and sent them back to work under the same hazardous conditions that caused the employees'

23

injuries.  Id. at 181-82.  The New Jersey Supreme Court held:

> These allegations go well beyond failing to warn of
> potentially-dangerous conditions or intentionally
> exposing workers to the risks of disease. There is a
> difference between, on the one hand, tolerating in the
> workplace conditions that will result in a certain number
> of injuries or illnesses, and, on the other, actively
> misleading the employees who have already fallen victim
> to those risks of the workplace. An employer's fraudulent
> concealment of diseases already developed is not one of
> the risks an employee should have to assume. Such
> intentionally-deceitful action goes beyond the bargain
> struck by the Compensation Act.

Id. at 182.  However, the New Jersey Supreme Court only allowed

plaintiffs to seek compensation for the aggravation of their

disease, not for the initial injury.  The Supreme Court

clarified, "allegations that defendants fraudulently concealed

knowledge of already-contracted diseases are sufficient to state

a cause of action for aggravation of plaintiffs' illnesses, as

distinct from any claim for the existence of the initial disease,

which is cognizable only under the Compensation Act."  Id. at

182.  The Supreme Court made clear that simply exposing the

employees to the risk of asbestos was not an intentional wrong.

Rather, it was the employer's failure to inform employees of the

discovered illness which created the substantial certainty that

the employee would suffer harm.

In Laidlow, 170 N.J. 602 (2002), the New Jersey Supreme

Court found the conduct prong could be satisfied when an employer

removed a safety device from a dangerous machine if the employer

had knowledge concerning the substantial or virtual certainty of

24

future injury which would result if the safety device was
removed.  The employer had a safety guard installed on a rolling
mill; however, the safety guard was never engaged.  Importantly,
the guard was placed in its proper position only when
Occupational Safety and Health Administration ("OSHA") inspectors
came to the plant.  It was undisputed that the employer
systematically deceived OSHA into believing that the machine was
guarded.  While the safety guard was disengaged, the plaintiff's
hand became caught in the rolling mill while he was operating it
and he suffered a serious and debilitating injury as a result.
Id. at 606-08.

In finding that summary judgment was inappropriate to
dismiss the Plaintiff's claims, the New Jersey Supreme Court held
that removal of a safety device alone was insufficient.  Rather,
the court looked to the totality of the circumstances.  First,
the court noted "the employer's knowledge concerning the
substantial or virtual certainty of future injury as a result of
its decision to disengage the guard" was crucial in determining
whether the intentional wrong exception applied.  In addition,
the court considered, "the prior close-calls, the seriousness of
any potential injury that could occur, [and] Laidlow's complaints
about the absent guard."  Id. at 622.  Since the Plaintiff was
not given the opportunity to conduct discovery as to his
employer's knowledge or appreciation of the risk in removing the

25

safety guard, summary judgment was inappropriate.  Id. at 619-20.

In Laidlow, the New Jersey Supreme Court also emphasized its holding in Millison and concluded that "the Legislature viewed occupational diseases as a hazard of employment compensable under the Workers' Compensation Act and not by way of common-law suit."

Most recently in Van Dunk v. Reckson Assoc., 415 N.J. Super. 490 (N.J. App. Div. 2010), the New Jersey Appellate Division held that an employee could sue his employer for damages arising out of his injuries from a collapsed trench.  The employer directed the plaintiff to enter the excavation site to properly lay fabric across a trench.  Id. at 494-95.  The trench was not properly supported and the employer acknowledged prior to sending the plaintiff into the excavation that it was dangerous.  Id. at 494. Less than five minutes after the plaintiff entered the trench, it caved in and buried plaintiff to his chest.  Id. at 495.  In a subsequent OSHA inspection, OSHA concluded that the employer willfully violated OSHA regulations and failed to protect its employees from cave-ins by an adequate protective system.  Id. at 495.  OSHA subsequently issued a fine to the employer.  Id.

In finding that the intentional wrong exception applied, the Appellate Division looked at the totality of the circumstances. First, the court noted the employer's deposition where he admitted to knowing that allowing an employee to enter the trench without any safety device could lead to injury or death.  The

26

court also noted that the employee's safety was disregarded to increase the defendant's profit and productivity.  The court also noted OSHA's conclusion that the employer's act was willful. Even with all these facts, the Appellate Division acknowledged that it was "close-call" in whether this case was barred by the WCA.  Id. at 503.  However, the court found the totality of the circumstances weighed in favor of allowing the Plaintiff's case to proceed and go to trial against his employer.  Therefore, summary judgment was denied.  Id. at 504.

In accord with the relevant case law, Aramark's motion for summary judgment should be granted.  There are only two facts which suggest Aramark knew of Plaintiff's toluene exposure. First, Plaintiff Steele complained once to a supervisor about the strong odor of the print towels.  However, the Plaintiff's deposition did not indicate that he complained to his supervisor about the lids on the drums being defective.  There is no evidence in the record that Aramark knew the lids to the drums did not seal properly.  In addition, the Plaintiff only complained to his supervisor once in July of 2007 about the odors, which was four months after he started driving the Quad-Aramark route.  Even if the Plaintiff did complain specifically about the condition of the drum lids, there is no evidence in the record that Aramark knew of the condition prior to July 2007 or could have prevented or at least reduced Plaintiff's exposure

27

sooner.

Second, the Plaintiff heavily relies on the pamphlet distributed to the Plaintiff by Aramark in July 2009, just weeks before he filed the instant litigation.  The Plaintiffs argue that this pamphlet is evidence that Aramark knew print towels were toxic and deceived Plaintiff Steele by not informing him in 2007 that he was transporting a toxic substance.

While this pamphlet does discuss how to handle print towels safely, it does not state that Aramark knew kidney disease, or any other severe illness, could result from exposure to toluene.  Rather, the pamphlet emphasizes environmental hazards which could result from the hazardous vapors, specifically fires and pollution of soil and groundwater.  Further, this pamphlet is in response to a pending regulation by the Environmental Protection Agency, whereby print towels would be exempt from hazardous waste laws as long as the towels do not contain any free liquids and are transported in covered, sealed, and labeled containers. There is no evidence that Aramark knew the drums were not sealed or that Plaintiff Steele ever informed Aramark that he had problems sealing the drums while transporting the print towels.

The Plaintiff has pointed to no regulation which Aramark failed to abide by in transporting the toluene towels and the Plaintiff provided no evidence that Aramark was aware of the dangers of toluene prior to this proposed regulation in July,

28

2009.  The pamphlet's focus was on environmental contamination, not employee exposure.  The Plaintiff claims he was injured beginning in April, 2007 but provides no evidence that Aramark knew prior to July 2009 about the potential injuries caused by toluene exposure.  Aramark is a laundry, not a chemical manufacturer, and it is not reasonable to imply knowledge of toluene's properties under these circumstances.

Finally, the absence of evidence warrants summary judgment in this case.  Here, there are no prior injuries resulting from toluene exposure, there are no OSHA citations, there are no violations of safety regulations, there is no deception by the employer and there is no knowledge of the risk of injury on the part of Aramark.  Indeed, Plaintiff's own expert testified that Aramark did not have any knowledge regarding the risk of kidney disease from exposure to toluene.  Specifically:

> Q: Do you have any reason to believe that Aramark was aware that there was a genetic propensity for African-Americans to contract a certain type of kidney disease from exposure to toluene?
>
> A: No.

(Aramark's Ex. E., Dep. of Jon J. Pina, at 135:12-17.)

When viewing the evidence in the totality of the circumstances, the Plaintiffs have failed to meet the context prong.  All the Plaintiffs have shown was that Mr. Steele was exposed to toluene and his employer was aware of the environmental hazards of toluene exposure two years after the

exposure occurred. New Jersey law is clear that an employee's exposure to hazardous workplace chemicals, and the employer's knowledge of the exposure, is insufficient to constitute an intentional wrong without further evidence of a willful act. See Millison, 101 N.J. at 179. Here, the Plaintiff has not shown any evidence that Aramark knew in 2007 about any dangers associated with toluene exposure and has not shown that Aramark knew toluene exposure could cause kidney disease.

Therefore, summary judgment will be granted as to Counts II and III of Plaintiff's complaint because the Plaintiff fails to meet the conduct prong.

### 2. Context Prong

Unlike the conduct prong, which is an issue of fact, the context prong is an issue of law to be decided by the court. Specifically, "the trial court must then determine whether, if the employee's allegations are proved, they constitute a simple fact of industrial life or are outside the purview of the conditions the Legislature could have intended to immunize under the Workers' Compensation bar." Laidlow, 170 N.J. at 623.

In this case, New Jersey law is clear that even if Plaintiff's allegations were proven, the context prong is not satisfied. Millison directly addressed the issue of whether exposure to hazardous workplace chemicals is a fact of industrial life by holding:

30

> Although defendants' conduct in knowingly exposing
> plaintiffs to asbestos clearly amounts to deliberately
> taking risks with employees' health, as we have observed
> heretofore the mere knowledge and appreciation of a
> risk-even the strong probability of a risk-will come up
> short of the "substantial certainty" needed to find an
> intentional wrong resulting in avoidance of the
> exclusive-remedy bar of the compensation statute. In the
> face of the legislature's awareness of occupational
> diseases as a fact of industrial employment, we are
> constrained to conclude that plaintiffs-employees'
> initial resulting occupational diseases must be
> considered the type of hazard of employment that the
> legislature anticipated would be compensable under the
> terms of the Compensation Act and not actionable in an
> additional civil suit.

Millison, 101 N.J. at 179.

This holding was later confirmed in Laidlow, where the New Jersey Supreme Court affirmed its holding that "the Legislature viewed occupational diseases as a hazard of employment compensable under the Workers' Compensation Act and not by way of common-law suit." Laidlow, 170 N.J. at 616.

Here, the Plaintiff's allegations, if proven, only show that the Plaintiff was exposed to a hazardous chemical, and Aramark became aware of the hazards of exposure in 2009, two years after the initial exposure. At this point, safety pamphlets were handed out to Aramark's employees. Without further evidence, Plaintiff's exposure to hazardous chemicals and subsequent occupational disease was a fact of life of industrial employment which the Legislature anticipated would be compensable under the WCA. Accordingly, Plaintiff's allegations also fail the context prong of the intentional wrong analysis.

31

Therefore, Counts II and III must be dismissed as they are barred by the WCA.  The Plaintiff does not dispute that Mrs. Steele's claim for loss of consortium is derivative of Plaintiff's tort claims.  Therefore, Count IV of Plaintiff's complaint should also be dismissed as to Aramark.

### 3.  Conclusion

Aramark's motion for summary judgment will be granted. Plaintiffs' evidence could not be viewed by a reasonable factfinder as falling within the intentional wrong exception to the WCA.  The Plaintiffs have failed to raise a genuine dispute of fact whether Aramark acted with knowledge that it was substantially certain that Plaintiff Steele would suffer injury during his transportation of print towels from Quad Graphics to Aramark.  In addition, the Legislature clearly intended this type of work place injury to be compensated under the WCA and not by common-law actions.  Therefore, Aramark's motion for summary judgment will be granted and Plaintiffs' complaint against Aramark will be dismissed in its entirety.

## V.  QUAD AND ARAMARK'S MOTION TO STRIKE PLAINTIFFS' EXPERTS AND FOR SUMMARY JUDGMENT

Both Quad and Aramark filed motions to bar Plaintiffs' experts and for summary judgment in addition to the motions already filed.  Aramark's motion will be dismissed as moot as the court has granted its previous motion for summary judgment dismissing Plaintiffs' claims as statutorily barred under the New

Jersey Worker's Compensation Act, discussed <u>supra</u>.  Consequently, the court will focus its analysis on Quad's motion to strike Plaintiffs' experts.

The Plaintiffs have provided four experts in support of their case: two medical experts, an occupational safety and health expert and an industrial hygienist expert.  This opinion will first discuss the standard of review pursuant to Rule 702 for expert testimony.  The Court will then examine whether the proposed testimony of each of Plaintiffs' proposed experts meets this standard.  Finally, the opinion will discuss whether summary judgment is appropriate.

### A.   Standard

The admissibility of expert witness testimony is governed by Rule 702, Fed. R. Evid., and the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably
> to the facts of the case.

Fed. R. Evid. 702.  As the Supreme Court explained in <u>Daubert</u>, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and

methodologically reliable in order to determine whether it is admissible under Rule 702.  Id. at 590-91; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 146-47 (1999) (holding that Daubert extends to testimony about "technical or other specialized knowledge") (internal quotations and citations omitted).

Under the law of this Circuit, when an evidentiary challenge is raised, Daubert and Rule 702 call upon the Court to examine the admissibility of expert testimony in light of three factors: the qualifications of the expert, the reliability of his or her methodology and the application of that methodology, and whether the testimony fits the matters at issue in the case.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994).  With regard to the qualifications prong, the Court of Appeals has explained that an expert's qualifications should be assessed "liberally," recognizing that "a broad range of knowledge, skills, and training qualify an expert as such."  Id. at 741.

In addition to being qualified to testify in an expert capacity, an expert witness whose testimony is offered by a party must base her opinions on reliable methodology.  The Court of Appeals explained in Paoli that

> Daubert explains that the language of Rule 702 requiring
> the expert to testify to scientific knowledge means that
> the expert's opinion must be based on the methods and
> procedures of science rather than on subjective belief or
> unsupported speculation; the expert must have good
> grounds for his or her belief.  In sum, Daubert holds

34

>       that an inquiry into the reliability of scientific
>       evidence under Rule 702 requires a determination as to
>       its scientific validity.

Id. at 742 (internal quotations and citations omitted).

Recognizing that the "inquiry as to whether a particular

scientific technique or method is reliable is a flexible one,"

the Court of Appeals has identified a nonexhaustive list of eight

factors[1] that courts may address in determining whether an

expert's methodology is reliable.   Id.; see also Heller v. Shaw

Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999).

    Finally, to be admissible under Rule 702, expert testimony

must "fit," or be relevant to, the facts at issue in the case.

Paoli, 35 F.3d at 743.   "Because Rule 702 demands that the expert

testimony assist the trier of fact, such testimony will be

admissible only if the research is sufficiently connected to the

facts and issues presented in a given case."   Suter v. General

Acc. Ins. Co. of America, 424 F. Supp. 2d 781, 787 (D.N.J. 2006)

---

    [1] The factors identified by the Court of Appeals for
assessing the reliability of an expert's methodology are:

>       (1) whether a method consists of a testable hypothesis;
>       (2) whether the method has been subject to peer review;
>       (3) the known or potential rate of error; (4) the
>       existence and maintenance of standards controlling the
>       technique's operation; (5) whether the method is
>       generally accepted; (6) the relationship of the technique
>       to methods which have been established to be reliable;
>       (7) the qualifications of the expert witness testifying
>       based on the methodology; and (8) the non-judicial uses
>       to which the method has been put.

Paoli, 35 F.3d at 742, n.8.

(citing Paoli, 35 F.3d at 743).  In other words, Rule 702's relevance standard requires that there be "a valid scientific connection" between the expert's testimony and the facts and issues in the case in order for the expert's testimony to be admissible.  Paoli, 35 F.3d at 743.

In toxic tort cases, courts have analyzed an expert's opinion on the causal connection between a plaintiff's injuries and the hazardous exposure by conducting two separate causation inquiries.  First, the expert should address general causation, which refers to whether the substance is capable of causing the observed harm generally.  Second, the expert should address specific causation, which refers to whether the substance actually caused the harm a particular individual suffered. Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584 (D.N.J. 2002); Pritchard v. Dow Agro Sciences, 705 F. Supp. 2d. 471 (W.D. Pa. 2010).  Importantly:

> the expert's journey from general causation to specific causation need not be just a two-step process. So long as, taken together, the experts are able to draw a chain of scientifically-reliable causal links that meets plaintiffs' requirements under the substantive tort law, the evidence is admissible and it will be left to the jury to establish the relative credibility of the parties' competing experts. Where, however, the expert reports leave wide, unexplained gaps in the causal chain, the evidence is not helpful to the trier of fact and must be excluded.

Pritchard, 705 F. Supp. at 483 (citing Perry v. Novartis Pharmaceuticals Corp., 564 F. Supp. 2d 452, 463 (E.D. Pa. 2008).

**B. Dr. Wedeen (medical expert)**

First, Quad seeks to exclude the testimony and report of Dr.
Wedeen, one of Plaintiff's medical experts.  Dr. Wedeen opines
that "toluene exposure was more likely than not, a contributing
cause of FSGS (Focal Segmental Glomerulosclerosis) in Mr.
Steele."  (Quad's Ex. J, Report of Dr. Wedeen date June 11, 2010,
"Wedeen Report.")  Quad argues that Dr. Wedeen's report should be
excluded because it is not reliable as it lacks good grounds and
lacks the fit requirement because Dr. Wedeen does not address
general and specific causation.  Quad does not challenge Dr.
Wedeen's qualifications, as Dr. Wedeen specializes in nephrology.

Specifically, Quad maintains that Dr. Wedeen only reviewed
Plaintiff's deposition transcript and selected medical records in
coming to his conclusion.  Dr. Wedeen did not consult any of the
nine fact witnesses deposed in this case who testified about
Quad's facility and industrial practices and Dr. Wedeen did not
review any of the written discovery. Dr. Wedeen also did not
consider the air sampling monitor reports provided by Quad which
showed the toluene exposure inside the Quad facility was far
below the OSHA and EPA guidelines.   Because Dr. Wedeen did not
review the full record of the case in coming to his opinion, Quad
argues that Dr. Wedeen did not have good grounds on which to base
his expert opinion.  Therefore, according to Quad, his methods
are not reliable and his opinion should be excluded.

In addition, Quad contends that Dr. Wedeen's opinion does not fit the facts of the case because he does not address general and specific causation.  First, in terms of general causation, Dr. Wedeen admitted in his deposition that there is nothing in the medical literature which discusses a causal link between toluene exposure and collapsing FSGS.  (Quad's Ex. K, Deposition of Dr. Wedeen, "Wedeen Dep.," 33:5-8.)  Further, Dr. Wedeen admitted that there was no medical literature which discussed exposure to toluene exacerbating FSGS.  (Wedeen Dep. At 72:25.)  Further, Dr. Wedeen testified that exposure to solvents alone cannot cause FSGS and he admitted that the cause of FSGS is widely accepted as unknown.  (Wedeen Dep. 37:5; 47:4-5.)  Therefore, Quad argues that Dr. Wedeen has not established general causation and has not shown that toluene exposure causes FSGS.

Further, Quad argues that Dr. Wedeen has also failed to establish specific causation, namely that Plaintiff's FSGS was caused by his exposure to toluene in Quad's facility.  Most importantly, it is undisputed that Plaintiff suffered from hypertension, which Dr. Wedeen admitted in his deposition can alone cause kidney failure.  (Wedeen Dep. 51:10.)  Dr. Wedeen did not perform a differential analysis to determine if it was more likely that Plaintiff's kidney failure was the result of hypertension or was the result of toluene exposure.  Without this

differential analysis, Dr. Wedeen's opinion does not establish specific causation and is unreliable.

In addition to hypertension, there are other speculative causes of Plaintiff's FSGS.  First, the Plaintiff is an African American and FSGS is more predominantly found in African Americans.  Toluene or other toxic substances are also present in the ambient air and the Plaintiff may have been exposed to some sort of substance outside the Quad facility.  Finally, the Plaintiff may also have an overactive immune system which is more susceptible to FSGS as evidenced by Plaintiff's severe allergy to bee stings.  None of these alternate causes were considered by Dr. Wedeen in his report.  Therefore, Quad maintains that Dr. Wedeen should be excluded as an expert in this case.

The Plaintiffs strongly oppose Quad's motion to exclude Dr. Wedeen.  First, the Plaintiffs admit that there is no medical literature discussing the causal relationship between toluene exposure and collapsing FSGS.  However, the Plaintiffs argue that Dr. Wedeen relies on literature discussing solvents, which include toluene, and kidney disease, which includes collapsing FSGS.  Therefore, this should satisfy the general causation requirement.

Next, the Plaintiffs argue that Dr. Wedeen consulted the following evidence in forming his opinion: Plaintiff's deposition, medical records of the Plaintiff, and medical

39

literature on the relationship between solvent exposure and kidney disease.  The Plaintiffs do not dispute that Dr. Wedeen did not consider any of the depositions of Quad employees or fact discovery exchanged in this case.  Those depositions, however, did not concern Mr. Steele's medical facts or the medical/scientific literature.

The Plaintiffs also admit that Dr. Wedeen was unable to conclude whether Plaintiff's exposure to toluene caused or exacerbated his kidney disease.  However, the Plaintiffs argue this should not prevent the admission of Dr. Wedeen's testimony. The Plaintiffs cite to New Jersey case law, which does not apply the <u>Daubert</u> standard, for their proposition that an expert need not show specific causation.  The Plaintiffs maintain that Dr. Wedeen's opinion that exposure to toluene was a contributing cause to the development of Plaintiff's FSGS is sufficient to satisfy the specific causation requirement.

The Plaintiffs also maintain the Dr. Wedeen did address alternate causes to Plaintiff's FSGS in his report and deposition.  Specifically, Dr. Wedeen testified that the Plaintiff's hypertension may have been a cause of his kidney disease, but that his toluene exposure certainly contributed to the development of that kidney disease and the FSGS and nephrotic syndrome.  (Pls.' Ex. F, Wedeen Dep. at 67:1-14.)

In addition, the Plaintiffs correctly argue that Dr. Wedeen

40

was not required to show that toluene was the sole cause of

Plaintiff's kidney disease.  Rather, Dr. Wedeen only needs to

show that the alternate cause was not the sole cause.  The

Plaintiffs rely on <u>Heller v. Shaw Industries, Inc.</u>, 167 F.3d 146,

156 (3d Cir. 1999).  In this case, the Third Circuit explained:

> A medical expert's causation conclusion should not
> be excluded because he or she has failed to rule out
> every possible alternative cause of a plaintiff's
> illness. As Professor Capra, Reporter to the Advisory
> Committee on the Federal Rules of Evidence, has put it:
> [T]o require the experts to rule out categorically
> all other possible causes for an injury would mean that
> few experts would ever be able to testify....
> ... Obvious alternative causes need to be ruled out. All
> possible causes, however, cannot be and need not be
> eliminated before an expert's testimony will be admitted.
> Daniel J. Capra, The Daubert Puzzle, 32 Ga.L.Rev. 699,
> 728 (1998).
> Differential diagnosis, as we noted in <u>Paoli</u>, is "the
> basic method of internal medicine." <u>Paoli</u>, 35 F.3d at 755.
> Dr. Papano engaged in this basic method in a reliable
> manner, ordering standard laboratory tests, physically
> examining the plaintiff, taking medical histories, and
> considering alternative causes of the plaintiff's illness.
> See id. at 755, 758. That he used this technique to
> "testify to a novel conclusion" is not sufficient grounds
> for excluding his testimony. Id. at 759 n. 27. Dr. Papano
> was not required to rule out all alternative possible
> causes of Heller's illness. Rather, only "where a
> defendant points to a plausible alternative cause and the
> doctor offers no explanation for why he or she has
> concluded that was not the sole cause, that doctor's
> methodology is unreliable." <u>Id.</u>

<u>Heller</u>, 167 F.3d at 156.  The Third Circuit also explained that a

temporal relationship between exposure to a chemical and a

subsequent illness could be sufficient grounds for an expert to

differentiate alternate causes.  <u>Id.</u> At 156-57.  The Third

Circuit cautioned that a "district court should take care not to mistake credibility questions for admissibility questions. If the medical expert's opinion on causation has a factual basis and supporting scientific theory that is reliable, it should be admitted." Id. at 157 (citations omitted).

Here, Dr. Wedeen's expert opinion has several shortcomings, but these shortcomings are a basis for cross examination and go to the weight of the expert report, not the admissibility. The most troubling aspect of Dr. Wedeen's report is his dismissal of Plaintiff Steele's hypertension as the sole cause of his FSGS without engaging in a more comprehensive differential analysis. However, Dr. Wedeen is a specialist in nephrology and concluded toluene exposure was more likely than not, a contributing cause of FSGS. Case law is clear that an expert does not need to rule out alternate causes, but merely needs to conclude that the alternate cause is not the sole cause of a party's injury. Heller, 167 F.3d at 156. Quad will be free to cross examine Dr. Wedeen on his conclusion and Quad's concerns over his differential analysis of the alternate causes of Plaintiff Steele's FSGS will be considered by the jury as they go to the weight of Dr. Wedeen's testimony, not its admissibility.

Similarly, Quad's concerns over the lack of authority establishing that toluene causes FSGS go towards the weight of Dr. Wedeen's opinion and not its admissibility. FSGS is a rare

form of kidney disease and toluene is one of hundreds of solvents.  It is not surprising that no medical literature exists that examines the specific narrow relationship between toluene exposure and FSGS.  Simply because an expert testifies to a novel conclusion does not render his testimony inadmissible where general scientific principles support it.  Id.  Dr. Wedeen justifies his conclusion because the temporal relationship between the solvent exposure and the diagnosis of FSGS.  Dr. Wedeen relies upon peer-reviewed scientific literature regarding the toxic effects of toluene exposure generally, as well as documenting a causal relationship between exposure to solvents (of which toluene is on type) and kidney disease (of which FSGS is one type).  In other words, the reliance by Dr. Wedeen, as a nephrologist, upon this literature as well as his experience and training in treating such kidney diseases provide a sufficiently reliable scientific basis for his opinion in this case.  In such a novel case involving this rare form of kidney disease, a temporal relationship may be the most significant factor in determining causation.  Quad will be given the opportunity to question Dr. Wedeen on his conclusion and the medical literature and experience on which he relies, but these concerns go towards the weight of his opinion and not its admissibility.

Therefore, Dr. Wedeen's opinion will not be excluded and Dr. Wedeen will be permitted to testify that toluene exposure was a

contributing cause of Plaintiff Steele's FSGS.

### C. Dr. Waller (medical expert)

Second, Quad seeks to exclude the opinion of Dr. Waller, Plaintiffs' second medical expert.  Dr. Waller is Plaintiff Steele's worker's compensation claim physician.  Dr. Waller opined, "Although in most cases of FSGS the cause cannot be identified, the relationship temporally between Mr. Steele's exposure and his development of FSGS militates strongly in favor of a causal relationship."  (Quad's Ex. T, expert report of Dr. Waller dated July 15, 2010 ("Waller report")).  Dr. Waller also testified that the Plaintiff has a 65% permanent disability.

Quad argues that Dr. Waller is not an expert in toxicology or nephrology and therefore, he is unqualified to render an opinion about causation.  In addition, Quad argues that while Dr. Waller is an expert in worker's compensation and can opine as to Plaintiff's disability, his opinion is unreliable and not supported by good grounds.

At oral argument, the Plaintiffs conceded that Dr. Waller is not a nephrologist or toxicologist.  As Dr. Waller lacks these specialities or a specialty in epidemiology, he is unqualified to offer an opinion as to the causal relationship between toluene exposure and kidney disease.  In their briefing and at oral argument, the Plaintiffs did not address Dr. Waller's lack of specialization in nephrology or toxicology and were unable to

44

show Dr. Waller was qualified to offer an opinion as to the intricate issue of the cause of Plaintiff's rare kidney disease, FSGS.

As Dr. Waller is a worker's compensation specialist and admittedly unqualified to render an opinion as to the causal relationship between FSGS and toluene exposure, Quad's motion to strike will be granted as to Dr. Waller's opinion on causation.

However, the Defendants do not contest that Dr. Waller, as a workers compensation claim physician, is qualified to testify about the degree of Plaintiff Steele's occupational impairment and it is clear that this opinion is relevant to the issue of damages.  Therefore, while Dr. Waller may not testify as to the causal relationship between toluene exposure and FSGS, Dr. Waller will be permitted to render an opinion on Plaintiff Steele's degree of occupational impairment as a result of his FSGS.

**D. Dr. Bates (Industrial hygienist)**

Third, Quad argues that Plaintiff's industrial hygienist expert, Dr. Bates, should be barred.  Dr. Bates opined that Plaintiff Steele was exposed to toluene vapors in the Quad facility.  Quad argues that this opinion should be barred because there is no valid scientific basis for this opinion and it does not fit the facts of the case.

Quad argues that Dr. Bates relies solely on Plaintiff's deposition testimony for the facts of the case.  Dr. Bates did

45

not consider deposition testimony of its employees on how the toluene drums and print towels were handled.  Further, Dr. Bates never visited the Quad facility or conducted any tests to measure the amount of toluene exposure at the facility.  In addition, Dr. Bates' opinions are based on assumptions that there were several ounces of liquid toluene in the drums Plaintiff transported. However, several Quad employees testified that drums are opened many times throughout the day and towels are wrung dry before placing them into the drums.  In addition, Dr. Bates uses the "inverse square" rule to estimate the Plaintiff's exposure to toluene, rather than relying on the air sampling results at the Quad facility which are traditionally relied upon to determine occupational chemical exposure.  In his deposition, Dr. Bates admitted that this rule is never used to estimate occupational exposure to vapors such as toluene.  (Bates Dep. 97:1-7.)

The Plaintiffs oppose this motion.  First, the Plaintiffs do not dispute that the only facts Dr. Bates considered in his opinion were derived from Plaintiff's deposition testimony. Rather, the Plaintiffs maintain that Dr. Bates did not need to rely on air sampling data to form his opinion.  The Plaintiffs also argue that the inverse square rule is acceptable to provide an estimate of toluene exposure.

After considering the parties' briefs and oral argument, Quad's motion striking Dr. Bates as an expert will be granted.

There are two particularly troubling aspects of Dr. Bates' report.  First, Dr. Bates ignores the factual evidence provided by Quad in drawing his opinion.  He did not consider any of the deposition testimony of the Quad employees which discuss how toluene towels are placed and retrieved from drums, and Dr. Bates did not visit the Quad facility in rendering his opinion or conduct his own tests to determine the level of toluene exposure.

Therefore, Dr. Bates' opinion that Plaintiff Steele was exposed to toluene in the Quad facility is not supported by good grounds and fails to fit the facts of this case.  Dr. Bates' opinion is not based on any facts specific to the Quad facility and Dr. Bates cannot be considered to have applied his scientific methodology to the particular facts of this case.  The opinion ignores the fact that all air sampling over the years at Quad detected negligible contamination lying far below the recognized occupational exposure limits.

Secondly, Dr. Bates' reliance on the inverse square rule also calls into question the reliability of his opinion.  Dr. Bates admitted in his deposition that the inverse square rule is not a reliable method to determine occupational exposure.  Specifically, at his deposition, Dr. Bates testified that there were no authorities endorsing the use of the inverse square rule to calculate occupational exposure to a chemical:

> Q: Now, can you cite to any authority which authorizes
> the use of the inverse square rule for the purpose of

47

calculating exposure to chemical?

A: There are no authorities on that.

Q: You would agree that the inverse square rule is used for and with accepted methodology in the scientific community for calculating exposure to things like radiation and noise?

A: That's generally what it's used for....

...

Q: Let me ask you if you agree with the following propositions or not.  The inverse square rule law is never used to estimate occupational exposure to vapors such as toluene, yes or no, do you agree?

A: I agree.

(Bates Dep. 94:14-95:22; 97:2-7.)

Nonetheless, Dr. Bates relied on the inverse square rule in estimating how much toluene Plaintiff Steele was exposed to when he transported the drums.  From this estimate, which is not grounded in the full facts of the record and based on an admittedly unreliable methodology, Dr. Bates concluded that the Plaintiff was exposed to an undue amount of toluene.

At oral argument, the Plaintiffs provided no explanation for their failure to provide Dr. Bates with the full factual record of this case and presented no authority for applying the inverse square rule to calculate occupational exposure.  The use of the inverse square rule is particularly troubling considering that actual routine air sample tests were done at the Quad facility to determine the level of toluene exposure.  Dr. Bates conceded in

48

his deposition that the air sampling tests performed at the Quad facility for chemical exposure showed Quad was within the OSHA permissive exposure limits for each chemical tested, including toluene.  (Bates Dep. 72:7-8.)  Any responsible and reliable opinion about Mr. Steele's exposure to toluene at the Quad facility would have to reckon with these benign air sample testing results.

Therefore, Dr. Bates' opinion does not fit the facts of the case and is not based on a reliable methodology and will be excluded.  Quad's motion to strike Dr. Bates as an expert will be granted.

### E. Mr. Jon J. Pina (Occupational Safety expert)

Finally, Quad moves to strike Mr. Pina, Plaintiffs' occupational safety expert.  Mr. Pina, like Plaintiffs' other experts, was not provided with any facts supplied by the defense, including Quad's air sampling tests, or any depositions from Quad's employees.  He also was not provided with specifics as to the operation of the Quad facility, including the air exchange rate in the Quad facility, whether Quad violated any OSHA requirements, how many drums were used in the facility, the ventilation system in the Quad facility or the training Quad employees received on handling solvents such as toluene.

In particular, Mr. Pina testified that he would want to see air sampling results for the Quad facility and he assumed no such

tests had been done since he was not provided with this information.  (Pina Dep. 12:4-20.)  Mr. Pina also testified to the importance of air sampling tests and that air monitoring was the only method accepted by OSHA for evaluating compliance. (Pina Dep. 144:14-15.)  Further, Mr. Pina admitted that air sampling is a more reliable method of assessing exposure than subjective measurements such as odor.  (Pina Dep. 17:19.)

Mr. Pina came to eight conclusions in his opinion, which he admitted were mostly based on assumptions since he was not provided with the full factual record of the case.  The Plaintiffs do not dispute dismissing six of the eight conclusions made by Mr. Pina, and those are abandoned.  However, the Plaintiffs still maintain that two of Mr. Pina's conclusions are admissible.

First, Mr. Pina concluded:

Quad Graphics failed to treat the free liquid toluene as a hazardous waste that was applied to the towels to wipe off the rollers.  They should have wrung out all excess liquid from the towels and placed the towels in a sealed metal container.  Initially they should have applied a minimal amount of toluene to the towels.  As a rule, every entire drum should be a hazardous waste, due to the variable amounts of toluene contamination.  As with any state statute, West Virginia may attempt to pass a variance of federal EPA statutes, but as a result they can't be less stringent than federal standards.

(Pina Report.)

During Mr. Pina's deposition, he asked if he had "any information from the record evidence that you reviewed that Quad

50

Graphics did not take the appropriate steps in order to be in
compliance with the one-drop rule so as to be exempt from a
designation of hazardous waste?"  Mr. Pina replied: "No I have no
information they didn't. . . ."  (Quad's Ex. W, deposition of Joe
Pina, "Pina Dep." at 7-16.)

Quad argues this opinion should be excluded because Mr. Pina
admitted he did not review the full factual record and there was
no evidence in the factual record he was given that Quad did not
comply with the one drop rule.  The Plaintiffs argue that Mr.
Pina should be allowed to testify to his conclusions that Quad
violated the one drop rule despite his deposition testimony.  The
Plaintiffs rely primarily on Mr. Steele's belated July 19, 2011
affidavit, which has been stricken for reasons explained above.

Quad's motion with regard to Mr. Pina's conclusion about the
one-drop rule will be granted.  There is no evidence that Mr.
Pina was given the Plaintiff's belated affidavit prior to issuing
his report and Plaintiff Steele's affidavit is inadmissible as
discussed supra in Section II.  Indeed, Mr. Pina issued his
report in December 2010 and the Plaintiff issued his affidavit in
July 2011.  Further, Plaintiff's interrogatory answers that the
towels were "soaked" with toluene is insufficient to show that
Quad violated the one drop rule.

Even considering the interrogatory answers, Mr. Pina was
still given an incomplete factual record and did not do any

51

examination of the Quad facility.  Importantly, Mr. Pina did not review the air sampling results which concluded Quad was within the OSHA permissive exposure limits for each chemical tested, including toluene.  Mr. Pina himself admitted to having no factual basis for this conclusion.

Therefore, Mr. Pina's conclusion regarding Quad's alleged violation of the one drop rule will be barred as it is not based on good grounds and not based on sufficient facts or data.

In his other remaining contested opinion, Mr. Pina concludes:

> Quad Graphics was definitely the "controlling" employer according to OSHA's Multi-employer Directive.  They were responsible for providing a safe working environment for all contractors, including vendors.

(Pls. Ex. R.)  Mr. Pina testified during his deposition that this conclusion was based on the assumption of exposure to toluene to Mr. Steele.  (Pina Dep. 112:13-14.)

Quad argues that this conclusion is admittedly based on an assumption and should be excluded.  The Plaintiffs stated in their brief that this conclusion is really in reference to Aramark as the controlling employer who is liable for the transportation of the print towels in unsealed drums.  However, at oral argument the Plaintiffs admitted that their representation in their brief was in error and that Mr. Pina's conclusion is that Quad Graphics, not Aramark, is the controlling employer according to OSHA's Multi-employer Directive.

This conclusion should be barred for two reasons.  First, this opinion is more an application of OSHA regulations and akin to a legal conclusion than a factual opinion.  Second, and more importantly, Mr. Pina admittedly based this conclusion on the assumption that Mr. Steele was exposed to toluene and not on any facts in the record.  It is clear that Mr. Pina is uninformed and his testimony is not based on a reliable method and does not fit the facts of this case.  Without a proper factual basis, Mr. Pina's conclusion that Quad is the controlling employer is merely a conclusion of law not grounded in the record and should be excluded.

Therefore, as both of Mr. Pina's conclusions are not based on the factual record and do not fit the facts of this case, Mr. Pina should be excluded as an expert and Quad's motion to strike Mr. Pina will be granted.

**G. Whether Quad is Entitled to Summary Judgment**

The Plaintiffs allege four causes of action against Quad. First, Plaintiffs allege Quad intentionally failed to warn plaintiff or provide safety equipment.  Count II of the complaint alleges Quad Graphics negligently failed to warn the plaintiff or provide proper safety equipment.  Count III of the complaint alleges that Quad Graphics conduct was outrageous and shocks the conscience.  Count IV of the complaint is a loss of consortium claim brought by Plaintiff Judikaelle Steele and is derivative of

Plaintiff Brian Steele's tort claims.

Quad argues that there is no evidence produced in discovery from which a reasonable juror could conclude Quad Graphics was responsible for Plaintiff Steele's injuries and therefore, summary judgment is appropriate.  The Plaintiffs do not dispute that they have failed to provide any evidence that Quad acted intentionally or engaged in conduct that was outrageous and shocks the conscience in order to establish liability under Counts I and III.  However, the Plaintiffs maintain that they have produced sufficient evidence to show negligence on the part of Quad and therefore, Counts II and IV should not be dismissed. The Plaintiffs allege Quad was negligent under two theories. First, the Plaintiffs allege Quad failed to comply with the one drop rule.  Second, the Plaintiffs allege Quad failed to make sure that the containers were tightly sealed prior to transport. The Plaintiffs do not discuss in their brief whether there is sufficient evidence to establish the causation element of their prima facie case.

As a preliminary matter, as the Plaintiffs have put forth no evidence showing that Quad acted intentionally in allegedly exposing Plaintiff to toluene vapors and there is no evidence that any of the alleged conduct by Quad is outrageous and shocks the conscience, the Court will dismiss Counts I and III of the Plaintiffs' complaint.

The remainder of this analysis will address whether the Plaintiffs have put forth sufficient evidence to establish a claim of negligence against Quad, giving all favorable inferences to Plaintiffs as the parties opposing summary judgment.

Under New Jersey law,[2] in order to establish a claim for negligence, a plaintiff must prove three elements:  (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach.  Endre v. Arnold, 300 N.J. Super. 136, 142 (App. Div. 1997).  "Whether a duty exists is solely a question of law to be decided by a court and not by submission to a jury." Id.  A landowner owes a duty to invitees to warn about dangerous conditions on the property that are either known or should have been discovered through reasonable inspection.  Hopkins v. Fox & Lazo Realtors, 132 N.J. 426. 433 (N.J. 1993).  Mr. Steele was an

---

[2] At oral argument, the parties agreed that New Jersey law controls the court's analysis.  Quad is a West Virginia facility, the Plaintiffs are Pennsylvania residents and Aramark is a New Jersey facility.  However, the parties represent and the court agrees that there is not a conflict between the three states regarding the prima facie case of negligence or the duty a landowner owes invitees.  See Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 433 (1993); Hawkins v. U.S. Sports Ass'n, Inc., 219 W. Va. 275, 279 (W.Va. 1992); Summers v. Giant Food Stores, Inc., 1999 Pa. Super. 314 (Pa. Super. 1999).  When sitting in diversity, a court must use the forum state's choice of law principles.  Echols v. Pelullo, 377 F.3d 272, 275 (3d Cir. 2004). Under New Jersey choice of law principles, in the absence of a conflict, New Jersey law will apply.  Rowe v. Hoffman La Roche, 189 N.J. 615, 621 (N.J. 2007)(holding that in the absence of an actual conflict, the law of the forum state applies to resolve the disputed issue).

invitee at Quad's West Virginia premises.

As discussed above, the Plaintiffs allege Quad was negligent under two theories.  First, the Plaintiffs allege Quad failed to comply with the one drop rule.  Plaintiff Steele's belated affidavit is excluded and there is no evidence that Quad failed to comply with the one drop rule.  Therefore, this theory of liability must fail.

Second, the Plaintiffs allege Quad failed to make sure that the containers were tightly sealed prior to transport.  It is undisputed that the allegedly defective lids to the drums in this case were provided by Aramark and Aramark is immune from liability pursuant to the Workers Compensation Act as discussed in Subsection II above.  However, the West Virginia Recyclable Shop Towels policy provides that containers transporting print towels must be sealed to prevent the release of fugitive air emissions.  This policy expressly provides that the generator (Quad), the transporter and the launderer (Aramark) are all jointly responsible for adherence to this policy.

While this is a policy and not an official regulation, it does create a basis for the imposition of a duty on Quad to ensure the drums were sealed.  Quad argues that because the drums and lids were provided by Aramark, it had no responsibility regarding whether the drums in fact were sealed containers.  However, the West Virginia shop policy indicates that it is the

joint responsibility of the launderer, transporter and generator
to ensure print towels are transported in sealed containers.
Therefore, while Aramark provided the drums, Quad also had a duty
to ensure that the drums were sealed prior to transport, and to
take reasonable precautions to ensure sealing.

The issue remains whether the Plaintiffs have set forth
sufficient evidence to show that the failure to properly seal the
drums caused Plaintiff Steele's rare kidney disease, FSGS. There
is no evidence put forth by the Plaintiffs as to how much toluene
Plaintiff Steele was exposed to as a result of the defective
lids.  Plaintiff's only remaining causation expert is Dr. Wedeen
who opined that Plaintiff Steele's exposure to toluene was more
likely than not a contributing cause of his FSGS.  Dr. Wedeen did
not explain whether his opinion was specific to Plaintiff
Steele's exposure to toluene as a result of the defective lids
while transporting the drums in his truck or whether his opinion
refers to Plaintiff Steele's exposure to toluene at Quad's
facility or if Dr. Wedeen was referring to the cumulative amount
of toluene exposure.  In any event, however, Quad's liability
could include exposure at the Quad premises and the exposure from
defective lids in the trucks, since Quad was jointly responsible
for taking reasonable measures to seal the outgoing barrels of
toluene-soaked print towels.

Dr. Wedeen's testimony, while lacking at points, is

sufficient to present a genuine issue of material fact as to
whether Plaintiff's exposure to toluene caused or contributed to
causing his FSGS.  Therefore, summary judgment as to Quad
Graphics is not appropriate as to Counts II and IV because there
is a genuine issue of material fact as to whether Quad's failure
to make sure the drums were properly sealed caused Plaintiff
Steele's injuries.

**VI.  CONCLUSION**

This matter came before the court on four separate motions.
First, Quad's motion to bar Plaintiff's Affidavit dated July 19,
2011 [Docket Item 78] is granted pursuant to Rule 37(c)(1) as
explained in Part III, <u>supra</u>.

Next, Aramark's motion for summary judgment [Docket Item 59]
is granted as the Plaintiffs are statutorily barred from bringing
their complaint against Aramark pursuant to the New Jersey
Workers' Compensation Act, N.J.S.A. § 34:15-8, because Plaintiffs
have adduced no evidence that Aramark acted willfully or
intentionally to cause harm in its conduct and the context in
which that conduct took place, for the reasons set forth in Part
IV.  Since this motion for summary judgment is granted, Aramark's
second motion to bar Plaintiffs' experts [Docket Item 64] is
dismissed as moot.

Finally, as explained in Part V, Quad's motion to strike
Plaintiffs' experts and for summary judgment [Docket Item 63] is

58

granted in part and denied in part.  Quad's motion to strike Dr. Bates and Mr. Pina as experts is granted.  Quad's motion to strike Dr. Waller as to his opinion on causation is granted; however, Dr. Waller will be permitted to testify as to the issue of damages, specifically about the nature and degree of Plaintiff Steele's occupational impairment as a result of his FSGS.  Quad's motion to strike Dr. Wedeen as an expert is denied.

Summary judgment will be granted dismissing Counts I and III of the Plaintiffs' complaint as there is no evidence in the record that Quad acted intentionally in allegedly exposing Plaintiff to toluene vapors or that any of the alleged conduct by Quad is outrageous and shocks the conscience, as explained in Part V.G, supra.  However, there is a genuine issue of material fact as to whether Quad's failure to make sure the drums were properly sealed when the soiled print towels were picked up by Plaintiff Steele for transport caused or contributed to Plaintiff Steele's FSGS.  Therefore, summary judgment as to Count II is inappropriate as to Quad.  Since Plaintiff Judikaelle Steele's loss of consortium claim is derivative of Plaintiff Steele's negligence claim, summary judgment is also inappropriate as to Count IV.

As the above motions have been decided, Quad's motion against Aramark to enforce the Indemnification Agreement [Docket Item 65] will no longer be held in abeyance.  Aramark must file

59

any opposition to this motion no later than thirty days (30 days) from the date of this order and any reply must be filed within seven days (7 days) of the filing of Aramark's opposition.

The accompanying Order will be entered.


**March 29, 2012**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge